# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| CHRISTOPHER TITA and IJANG FOMUKONG-TITA, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>    v.<br><br>THE UNITED STATES,<br><br>    *Defendant.* | Case No. 1:17-cv-1461-MBH L<br><br>Hon. Susan G. Braden<br>Hon. Marion Blank Horn |

## JEC GROUP'S STATEMENT OF INTEREST IN SERVING AS INTERIM LEAD COUNSEL OF THE DOWNSTREAM CLASS

Jay Edelson
jedelson@edelson.com
EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

William S. Consovoy
will@consovoymccarthy.com
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
Tel: 703.243.9423

Hon. Dwight E. Jefferson
djefferson@coatsrose.com
COATS ROSE
9 Greenway Plaza, Suite 1100
Houston, Texas 77046
Tel: 713.651.0111
Fax: 713.651.0220

Michael L. Slack
mslack@slackdavis.com
Slack & Davis, L.L.P.
2705 Bee Cave Road, Suite 220
Austin, Texas 78746
Tel: 521.795.8686

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................... 1

II.  BACKGROUND ..................................................................................... 3

    A.  Hurricane Harvey and the Resulting Litigation .................................... 3

    B.  The Attorneys' Fee Issue ......................................................................... 6

III.  CONFLICTS AND DIFFERING INTERESTS CALL FOR THE CREATION
    OF SEPARATE TRACKS AND APPOINTMENT OF SEPARATE COUNSEL
    TO LEAD EACH TRACK ...................................................................... 7

IV.  APPOINTMENT OF INTERIM LEAD CLASS COUNSEL IS NECESSARY
    TO ENSURE THE ORDERLY AND EFFICIENT PROGRESSION OF THIS
    LITIGATION, PARTICULARLY CLASS CERTIFICATION
    PROCEEDINGS ...................................................................................... 9

V.  THE JEC GROUP SHOULD BE APPOINTED INTERIM LEAD COUNSEL
    OF THE DOWNSTREAM CLASS ..................................................... 10

    A.  The JEC Group Has Done Significant Work Identifying and
        Investigating Potential Claims ............................................................. 11

    B.  The JEC Group Has Substantial Experience Handling Complex Class
        Action Litigation .................................................................................. 13

    C.  The JEC Group Has Extensive Knowledge of Constitutional Claims
        Against the Government ....................................................................... 16

    D.  The JEC Group Can Commit Substantial Resources to Representing
        the Class ............................................................................................... 17

    E.  The JEC Group's Position on Fees is in the Best Interests of
        the Class ............................................................................................... 19

VI.  CONCLUSION .................................................................................... 22

# TABLE OF AUTHORITIES

## United States Supreme Court

*Arkansas Game & Fish*,
    568 U.S. 23 (2012) ................................................................. 11–12

*Common Sense Alliance v. San Juan Cnty.*,
    No. 15-1366 (U.S. June 10, 2016) .................................................. 17

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999) ........................................................................ 8

*Palazzolo v. Rhode Island*,
    533 U.S. 606 (2001) ...................................................................... 12

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) .................................................................. 16

## United States Court of Appeal

*Appolo Fuels, Inc. v. United States*,
    381 F.3d 1338 (Fed. Cir. 2004) ..................................................... 12

*Haggart v. Woodley*,
    809 F.3d 1336 (Fed. Cir. 2016) ........................................ 19 n.10, 20

*In re Synthroid Marketing Litigation*,
    264 F.3d 712 (7th Cir. 2001) .................................................. 19, 20

*Wigod v. Wells Fargo Bank, N.A.*,
    673 F.3d 547 (7th Cir. 2012) ........................................... 15 18 n.9

## United States Court of Federal Claims

*St. Bernard Par. Gov't v. United States*,
    121 Fed. Cl. 687 (2015) .............................................................. 11–12

*King v. United States*,
    93 Fed. Cl. 718 (2010) ............................................................... 17–18

*Wilfong v. United States*,
    480 F.2d 1326 (Ct. Cl. 1973) ........................................................ 12

**United States District Court**

*In re Ameriquest Mortg. Co. Mortg. Lending Practices Litig.*,
    No. 05-CV-7097, 2006 WL 3227883 (N.D. Ill. Nov. 7, 2006) ............................ 8

*In re Facebook Privacy Litig.*,
    No. C 10-02389, dkt. 69 (N.D. Cal. Dec. 10, 2010) ......................................... 15

*In re: JP Morgan Chase Bank Home Equity Line of Credit Litig.*,
    No. 10-cv-03647, dkt. 37 (N.D. Ill. July 16, 2010) .......................................... 15

*In re Mun. Derivatives Antitrust Litig.*,
    252 F.R.D. 184 (E.D.N.Y. 2008)........................................................................ 10

*In re: National Collegiate Athletic Association Student-Athlete Concussion Injury Litigation*, No 16-C-8727, dkt. 90 (N.D. Ill. Nov. 30, 2016) ...................... 14–15

*In re Netflix Privacy Litig.*,
    No. 11-cv-00379, dkt. 59 (N.D. Cal. Aug. 12, 2011)........................................ 15

*In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*
    MDL No. 2179, 2012 WL 2236737 (E.D. La. June 15, 2012) .............20, 22 n.11

*In re Vioxx Prods. Liab. Litig.*,
    650 F. Supp. 2d 549 (E.D. La. 2009) ......................................20, 21, 22, 22 n.11

*LeBeau v. U.S.*,
    222 F.R.D. 613 (D.S.D. 2004).............................................................................. 8

**Statutes**

42 U.S.C. § 4654(c) ................................................................................................ 3, 19–20

**Miscellaneous Authority**

Allison Grande,
    *Titan Of The Plaintiff's Bar: Jay Edelson* .................................................. 14 n.6

David Lat,
    *Prominent Young Partners Leave Biglaw for a High-Powered Boutique* ........ 16

Dawn Rhodes,
   *California Judge: Illinois Facebook 'Tagging' Lawsuit Can Proceed* ........18 n.9

Diana Novak Jones,
   *Ill. Powerhouses Stay On Top Of Chicago's Trends* ...................................14 n.7

Federal Judicial Center,
   Manual for Complex Litigation (Fourth) .................................................*passim*

Herb Weisbaum,
   *How You Could Get $500 Per Call For Those*
   *Unwanted Messages Six Years Ago,* .........................................................18 n.9

Kiah Collier,
   *Can flooded-out Houstonians win lawsuits against Army Corps?*.............11 n.4

RCFC 23(g) ...........................................................................................*passim*

# I.    INTRODUCTION.

Plaintiffs Christopher Tita and Ijang Fomukong-Tita are represented by a distinguished legal team that seeks to lead a class action alleging downstream takings claims against the federal government following the Army Corps of Engineers' decision to release water from the Addicks and Barker reservoirs in the aftermath of Hurricane Harvey. The team consists of (1) the Honorable Dwight E. Jefferson of Coats Rose in Houston, a former Harris County Judge and current litigator with experience in insurance and mass tort cases, including weather damage appraisal disputes; (2) Jay Edelson, a nationally-recognized leader in class actions known for his creative approach to resolving high-profile disputes and obtaining large monetary recoveries for plaintiff-classes in situations where others fail; (3) William S. Consovoy, the leader of a boutique constitutional litigation firm composed of former Supreme Court and Appellate Court clerks with particularized expertise in federal constitutional and administrative law cases; and (4) Michael Slack, a former NASA engineer turned litigator with decades of accolades to his name stemming from his representation of plaintiffs in high-profile personal injury, mass tort and class action cases.[1] Together, this team—whom we'll call the JEC Group—will provide unmatched representation for the class of homeowners

---

[1]    Mr. Slack would chair a slate of attorneys acting as a proposed Plaintiffs' Steering Committee ("PSC") and overseeing various, particularized areas of this litigation. If appointed, the JEC Group proposes to separately present to the Court for approval a proposal as to the attorneys to be named to the PSC, their specific backgrounds and experience, and the roles they would each serve on the PSC. And of course, the JEC Group would welcome attorneys from other groups to participate in the PSC as well.

damaged by the government's release of water from the reservoirs, the so-called "downstream" class.

In deciding who to appoint as lead counsel, the Court must broadly assess two things. The first is whether proposed lead counsel has the experience, skill, knowledge, and commitment to pursuing these cases to a successful result, and the second is whether the attorneys understand what a truly successful outcome for the class would entail. Here, the JEC Group stands in the best position when it comes to answering both questions. From a substantive legal perspective, in terms of their specific knowledge of this case, as well as their overall capability and acumen, the JEC Group stands the best chance of prevailing in these difficult inverse condemnation claims. As importantly, however, the JEC Group understands that a successful result for homeowners can only come from representation that takes into account how the lawyers should be compensated—here, based on the fee-shifting regime at play, on a lodestar basis.

That's extremely important given the issues in this case because tragedies like Hurricane Harvey often attract attorneys looking to capitalize on the aggregate nature of the claims while doing no work beyond gathering lots of clients, the thought being that contingent fee agreements with thousands of clients may ultimately result in a large percentage of the recovery—either classwide or in the aggregate through individual case resolutions. But allowing such agreements where counsel is entitled to, say, 30% of the recovery will all but guarantee that even a "win" in court would result in most plaintiffs losing their properties. This is

contrary to the entire purpose of the inverse condemnation regime, whose goal is to make plaintiffs whole for the necessary, but unfortunate, taking of their property by the government. That's why Congress provided for fee-shifting in these cases, which requires that attorneys are compensated by the government on top of the recovery obtained for the homeowners. *See* 42 U.S.C. § 4654(c). This is also why awarding fees based on a contingent percentage of the homeowner's recovery has been found to be preempted and thus unavailable.

The JEC Group shares this commitment to the idea that the victims here should be made whole, and consequently, if named lead counsel, the JEC Group will agree to be compensated not from any recovery to the class or any individual client, but only through whatever statutory fees can be obtained from the government and approved by the Court. In short, and as explained more fully below, because the JEC Group can provide homeowners with an exceptional array of relevant skills, and will do so without impeding their ability to obtain full recovery and rebuild their properties, we respectfully request that the Honorable Dwight E. Jefferson, Jay Edelson and William S. Consovoy be appointed interim lead counsel of the downstream class, with Michael Slack appointed as Chair of the Plaintiffs' Steering Committee.

## II.    BACKGROUND.

### A.    Hurricane Harvey and the Resulting Litigation.

On August 25, 2017, Hurricane Harvey, one of the strongest and most damaging hurricanes in the history of Texas, made landfall in the southeast portion

of the state, and with it, brought severe winds and extremely heavy rainfall. Relevant to this litigation, Harvey led to a cascading series of effects on Houstonians living on the west side of the city.

First, waters began rising dramatically in two reservoirs serving as part of the local flood control system operated by the U.S. Army Corps of Engineers, the Addicks and Barker reservoirs. As a result, thousands of homeowners living within the reservoirs' watersheds saw waters quickly flood their homes and other buildings, leaving the properties severely damaged or, in some cases, uninhabitable.

Next, in response to the rapidly rising water levels and in large part to protect downtown Houston from flooding itself, on August 28, 2017, the U.S. Army Corps of Engineers began significantly expanding the release of water from the reservoirs. As gates at both reservoirs opened and water was released into the nearby Buffalo Bayou, adjacent neighborhoods and roadways that were not otherwise flooded (or were subject to significantly less flooding than other affected areas) became inundated with water. There too, thousands of homes, businesses, and other properties were flooded, significantly damaged, and in many instances, rendered uninhabitable.

In the following weeks, numerous lawsuits were filed, styled as both class and individual actions, against the United States in the Court of Federal Claims. The cases generally allege that the decisions first to delay the release of waters from the Addicks and Barker reservoirs, and then later to increase the flow of waters released from the reservoirs, along with the resultant flooding to surrounding

neighborhoods, acted as a governmental taking of their property under the Fifth Amendment to the United States Constitution. In each lawsuit, the plaintiffs seek just compensation for the alleged taking of their property. To date, more than 60 cases have been filed in the Court of Federal Claims.

As alluded to above, based on the factual and procedural posture of their claims in this litigation, plaintiffs can largely be broken up into two separate groups: "upstream" plaintiffs—those whose properties were allegedly damaged as a result of the Army Corps of Engineers' initial delay in releasing waters from the reservoirs, and "downstream" plaintiffs—those whose properties were allegedly damaged as a result of the August 28, 2017 decision to significantly increase the release of water from the reservoirs.[2]

There exists a clear conflict of interest between the upstream and downstream plaintiffs. That is, one group—the upstream plaintiffs—is likely to claim that the government should have released *more* water from the reservoirs. The other group—the downstream plaintiffs—is likely to claim that the government should have released *less*. In light of this conflict, these groups should have different counsel; hence the JEC Group's decision to represent only the downstream plaintiffs.

Further, as raised by some at the October 6th initial status, there may also

---

[2]     As the Court has recognized, there is a third group comprised of both upstream and downstream plaintiffs who have expressed a desire not to participate in any class proceedings and instead, pursue their claims against the government individually.

exist a potential conflict for the attorneys who are seeking lead here, but doing so—at least in part—in the hope of securing themselves leadership positions in the related Hurricane Harvey insurance litigation, as well. There is likely no question that the insurance claims will result in a significantly larger recovery for both the plaintiffs and their attorneys, and securing a lead role here could be viewed as lending itself to arguments that the attorneys are more knowledgeable of the relevant issues, can better coordinate across the two sets of cases (if needed), and the like. The JEC Group is not one of those groups and they are instead solely committed to prosecuting the claims of the downstream class only and are not seeking any role in the insurance litigation.

B.      The Attorneys' Fee Issue.

Given the widespread destruction caused by Hurricane Harvey, these cases obviously carry with them the characteristics of both class and mass actions. Typical in those cases are the contingent fee arrangement between lawyers and their clients. While those sorts of fee arrangements are unremarkable in such cases, it's important to understand that they are problematic in property cases, where the available compensation is necessary to rebuild homes and businesses and thus lawyers fees of, say, 1/3 would make any recovery meaningless to the vast majority of clients who are carrying significant mortgages on their properties. The inverse condemnation regime understands this problem and solves it by providing for statutory fee shifting, which, if properly understood, means counsel is limited to their reasonable lodestar and, in takings cases, may not base fees on a percentage of

recovery. Thus, it's important that the attorneys involved in this litigation—and certainly those to be appointed lead counsel—understand and accept this limitation as it relates to their client's recovery since it's fundamental to carrying out the intent of the law. As explained below, the JEC Group disclaims any contingency fees and seeks to be paid—to the extent they are able to achieve a successful recovery on behalf of their clients—on a reasonable lodestar basis.

## III. CONFLICTS AND DIFFERING INTERESTS CALL FOR THE CREATION OF SEPARATE TRACKS AND APPOINTMENT OF SEPARATE COUNSEL TO LEAD EACH TRACK.

After the cause of the flooding became clear—at least with respect to the homeowners in the vicinity of the Addicks and Barker reservoirs—homeowners began filing lawsuits in droves. Those suits came in all shapes and sizes, from individual actions filed by a single family against the Government, to putative class actions filed by several homeowners, both individually and on behalf of all others who experienced similar flooding. And behind the filings were attorneys who engage in various types of litigation, from traditional business-to-business litigation, to mass torts, to claims specifically involving inverse condemnation, to class actions.

With the dust having settled somewhat, certain issues have come to light. As stated above, there exists a clear conflict of interests between the upstream and downstream plaintiffs. Indeed, the arguments underlying the claims of those respective groups are directly at odds. Moreover, and perhaps while not quite amounting to a conflict, there is some measurable tension between the cases proceeding on a class versus an individual basis. Those prosecuting individual

claims have voiced skepticism that a class action is appropriate, and given that homeowners will need to opt in to any class settlement, it's likely that numerous individual actions will seek to move forward alongside any putative class action(s).

Given these competing and sometimes conflicting interests, the Court should establish separate tracks for these cases. *Cf. In re Ameriquest Mortg. Co. Mortg. Lending Practices Litig.*, No. 05-CV-7097, 2006 WL 3227883, at *4 (N.D. Ill. Nov. 7, 2006) (directing the appointment of separate lead counsel and steering committees for class and non-class cases). And where potential conflicts exist between various classes in the same litigation, the Court should appoint separate counsel and representatives for each group. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999) (explaining that classes with conflicting interests must have separate representation). *See also LeBeau v. U.S.*, 222 F.R.D. 613, 618 (D.S.D. 2004) (holding that counsel could not represent two groups of plaintiffs who had conflicting claims against government). Thus, a class action track should be created for upstream plaintiffs with lead counsel appointed to prosecute those cases. A class action track should be created for downstream plaintiffs with different lead counsel appointed to prosecute those cases. And, an individual track should be created for those property owners who wish to pursue their claims individually.[3] As explained below, the JEC

---

[3]     In this unique context, especially given that class certification here (if any) would be on an opt-in basis, counsel cannot effectively represent both class and individual claimants. For example, lawyers may have their own financial incentives to push clients into one track or the other believing (correctly or not) that they stand to recover more attorneys' fees. Given that, there needs to be independent class and individual counsel such that plaintiffs who are considering which track best suits

Group is best positioned and seeks only to be appointed interim lead class counsel on behalf of the downstream plaintiffs.

## IV. APPOINTMENT OF INTERIM LEAD CLASS COUNSEL IS NECESSARY TO ENSURE THE ORDERLY AND EFFICIENT PROGRESSION OF THIS LITIGATION, PARTICULARLY CLASS CERTIFICATION PROCEEDINGS.

Before addressing why the JEC Group should be appointed lead counsel of the downstream class, it is worth pausing to consider the issue of interim lead counsel. We understand that the Court intends to make a final decision as to the appointment of lead class counsel in conjunction with a ruling on class certification—which is standard practice—but the Court should nevertheless appoint interim class counsel now to ensure the efficient progression of pre-certification proceedings, particularly any motions for class certification.

Pursuant to RCFC 23(g)(3), this Court "may designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action." Designation of interim counsel "clarifies responsibility for protecting the interests of the class during precertification activities, such as making and responding to motions, conducting any necessary discovery, moving for class certification, and negotiating settlement." Federal Judicial Center, Manual for Complex Litigation (Fourth) § 21.11. While multiple attorneys or groups of attorneys may ultimately seek to be designated lead counsel of the downstream class, there is no reason to require each group to file separate motions for class

their needs can speak with the different, independent groups of counsel in order to make the best decision for themselves.

certification. Reviewing and responding to multiple—and potentially inconsistent—motions for class certification would place an unreasonable and unnecessary burden on both the government and this Court. Instead, this Court should appoint one or more attorneys as interim lead counsel to coordinate pre-certification activities on behalf of the putative downstream class (including filing a single motion for class certification), while reserving a final decision on ultimate lead class counsel until the time of class certification.

When determining interim class counsel, "courts generally look to the same factors used in determining the adequacy of class counsel." *In re Mun. Derivatives Antitrust Litig.*, 252 F.R.D. 184, 186 (E.D.N.Y. 2008). Thus, for the reasons explained below, the JEC Group can appropriately be appointed interim lead counsel of the downstream class, with their appointment to be reconsidered (and potentially confirmed) in conjunction with the Court's ruling on class certification.

## V.   THE JEC GROUP SHOULD BE APPOINTED INTERIM LEAD COUNSEL OF THE DOWNSTREAM CLASS.

Pursuant to this Court's October 11 Order, counsel wishing to be considered for appointment as lead class counsel should set forth their qualifications following the five Rule 23(g)(1) factors: (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (3) counsel's knowledge of applicable law; (4) the resources that counsel will commit to representing the class; and (5) any other information relevant to the assignment. No single factor is determinative; rather, each must be considered,

along with "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." RCFC 23(g)(1)(B); *see also* Manual for Complex Litigation (Fourth) § 10.224. As explained below, consideration of each of these factors strongly supports appointment of the JEC Group as lead class counsel for the downstream plaintiffs.

### A. The JEC Group Has Done Significant Work Identifying and Investigating Potential Claims.

While some other lawyers seeking lead may have focused their efforts on corralling Harvey flood victims into meetings to pitch signing retainers with one-third contingency fee provisions (ensuring their "clients" will never be made whole),[4] the JEC Group has focused on developing a strategy to make as many homeowners whole as possible. That strategy is focused on the reality that downstream homeowners stand the best possible chance of recovery—either through litigation or settlement—as part of a class action.

Here, the factors the downstream plaintiffs will have to prove are perfectly situated for class treatment. To demonstrate that the government's release of flood waters from the Addicks and Barker reservoirs constitutes a temporary taking entitling homeowners to just compensation, "plaintiffs must establish: (1) a protectable property interest under state law; (2) the character of the property and

---

[4]      *See* Kiah Collier, *Can flooded-out Houstonians win lawsuits against Army Corps?*, The Texas Tribune (Sept. 28, 2017) https://www.texastribune.org /2017/09/28/will-flooded-out-houstonians-prevail-lawsuits-against-army-corps (discussing how lawyers are "recruiting" clients through pitches over free fajitas by promising "quick cash").

the owners' 'reasonable investment-backed expectations'; (3) foreseeability; (4) causation; and (5) substantiality." *St. Bernard Par. Gov't v. United States*, 121 Fed. Cl. 687, 719 (2015) (J. Braden) (citing *Arkansas Game & Fish*, 568 U.S. 23, 38–40 (2012)).

To prove reasonableness of investment-backed expectations will require looking to "the regulatory regime in place at the time the claimant acquires the property at issue . . . to shape the reasonableness of [investment-backed] expectations." *Palazzolo v. Rhode Island*, 533 U.S. 606, 633 (2001) (O'Connor, J., concurring); *see also Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1348–49 (Fed. Cir. 2004). In flooding cases, this can be shown by historical comparisons of instances of flooding. *St. Bernard Parish Gov't*, 121 Fed. Cl. at 720 (quoting *Arkansas Game*, 133 S. Ct. at 522). To prove this element, the JEC Group has already begun investigating whether the rapid release of water from the Addicks and Barker reservoirs was a part of an established contingency plan and any instances of relevant flooding in the past. The JEC Group's preliminary investigation has made clear that this element can be shown through the common proof required to certify a class.

The JEC Group has also prepared for arguments the government is likely to make to avoid liability. On the issue of causation, the government could argue that this is not a taking but "simply a random [flood] event induced more by an extraordinary natural phenomenon than by Government interference." *Wilfong v. United States*, 480 F.2d 1326, 1329 (Ct. Cl. 1973). The JEC Group has focused on

compiling evidence showing that downstream plaintiffs' homes would not have flooded absent the government's decision to increase the release of water in order to counter this potential causation argument. The ultimate answer to that question will impact the downstream plaintiffs in the same way, further proof that class treatment is appropriate.

Finally, in addition to its broad-based research and investigation in the law and facts generally, the JEC Group benefits from the participation of Judge Jefferson. From his home base in Houston, Judge Jefferson is part of the Houston community and has toured affected areas and spoken with affected property owners. Judge Jefferson will continue to provide valuable insight and factual development given his direct connection with affected property owners.[5]

## B.  The JEC Group Has Substantial Experience Handling Complex Class Action Litigation.

The JEC Group is also unquestionably experienced with class actions and complex litigation. *See* RCFC 23(g)(1)(a)(ii). Judge Jefferson, Mr. Consovoy and Mr. Slack all have substantial experience with class and mass action issues, and Mr. Edelson, founder and CEO of Edelson PC, is one of the most experienced class action attorneys in the country. (*See* Firm Resumes of Edelson PC, Hon. Dwight E. Jefferson, Consovoy McCarthy Park, and Slack & Davis L.L.P., attached as Exhibits 1 – 4.) Indeed, Mr. Edelson has served, and continues to serve, as lead counsel in

---

[5]     Likewise, Mr. Slack's firm, Slack & Davis, is based in Texas—with multiple locations throughout the State—and has strong ties to the Houston community, long standing relationships with affected Houstonians, and experience working with many of the other attorneys representing plaintiffs in this litigation.

state- and nationwide-class action lawsuits involving a wide range of complex constitutional issues and public policy concerns. He has been called "one of the most creative minds in the legal industry" by the American Bar Association and named a Titan of the Plaintiff's Bar by Law360. The latter noted that, in the class action context, "[h]e has taken on some of the biggest companies and law firms in the world, and has had success where others have not."[6] In a similar vein, one court has described Edelson and his firm as class action "pioneers." And more recently, Edelson PC was recognized by Law360 as one of six (and the only plaintiff's firm) Illinois Powerhouses, along with Kirkland & Ellis, Sidley Austin, Mayer Brown, Dentons, and Jenner & Block.[7] *See In re Facebook Privacy Litig.*, No. C 10-02389, dkt. 69 (N.D. Cal. Dec. 10, 2010). Recovering the full value of class members' properties is going to be far from a slam-dunk, and they deserve counsel who can approach this unique takings case with the creativity and track-record required to win.

Mr. Edelson's reputation for leadership in class action litigation has regularly led courts to appoint him as lead counsel in high-profile cases featuring widely divergent legal issues. *See, e.g., In re: National Collegiate Athletic Association Student-Athlete Concussion Injury Litigation*, No 16-C-8727, dkt. 90 (N.D. Ill. Nov.

---

[6]     Allison Grande, *Titan Of The Plaintiff's Bar: Jay Edelson*, Law360 (Oct. 1, 2014) https://www.law360.com/articles/581584/titan-of-the-plaintiffs-bar-jay-edelson.

[7]     Diana Novak Jones, *Ill. Powerhouses Stay on Top of Chicago's Trends*, Law360 (Oct. 3, 2017), https://www.law360.com/articles/968074/ill-powerhouses-stay-on-top-of-chicago-s-trends.

30, 2016) (appointing Edelson as co-lead counsel in multidistrict litigation involving 100 personal injury class actions over concussion-related brain injuries); *In re Netflix Privacy Litig.*, No. 11-cv-00379, dkt. 59 (N.D. Cal. Aug. 12, 2011) (appointing Edelson as lead counsel in privacy lawsuit against major tech company); *In re Facebook Privacy Litig.*, 10-cv-02389, dkt. 69 (N.D. Cal. Dec. 10, 2010) (same); *In re: JP Morgan Chase Bank Home Equity Line of Credit Litig.*, No. 10-cv-03647, dkt. 37 (N.D. Ill. July 16, 2010) (appointing Edelson as lead counsel in multibillion dollar lawsuit against Citibank, Chase, and Wells Fargo at the height of the financial crisis). In one such case, he obtained billions of dollars of relief for struggling homeowners during the great recession (and, as here, sought fees on top of the class recovery, not out of it).

In another first-of-kind lawsuit in the aftermath of the housing collapse, Edelson achieved the first decision allowing consumers the ability to sue banks for the failure to honor home loan modification agreements. *See Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 585–86 (7th Cir. 2012). One Seventh Circuit judge in that case noted that that the issues involved were "of vital importance to the economic health" of the nation, and that settlement was necessary "not only for the good of the litigants but for the good of the country." *Id.* at 586 (Ripple, J., concurring). Edelson's ultimate class settlement in that case enabled numerous people to save their homes.

Such effective representation in class actions is the result of Mr. Edelson's extensive experience litigating them, and supports his appointment as lead class

counsel along with the JEC Group proposed here. With Mr. Edelson's inclusion, the JEC Group would give the class a significant resource: a skilled attorney with a thorough, pre-existing knowledge of what a class action of this scope and magnitude requires. Appointing the JEC Group would also serve the class by promoting judicial economy. Mr. Edelson's familiarity with the inherent procedural and substantive complexities of class actions will ensure the speedy resolution of this case and efficient use of the parties' time and resources.

C.    **The JEC Group Has Extensive Knowledge of Constitutional Claims Against the Government.**

In addition to the JEC Group's experience handling complex litigation and class actions generally, Mr. Consovoy brings to the JEC Group his valuable experience in constitutional and administrative law. A former clerk to United States Supreme Court Justice Clarence Thomas and Fifth Circuit Judge Edith H. Jones, Mr. Consovoy is the founder of Consovoy McCarthy Park, a boutique law firm specializing in appellate and Supreme Court advocacy. He is also the co-director of both the Supreme Court Clinic and the Administrative Law Clinic at George Mason University. He has argued multiple, high-profile, constitutional cases before the Supreme Court—including with respect to class action issues, *see Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016)—and his firm has been recognized as a collection of "brilliant lawyers" focusing on "headline-making cases." David Lat, *Prominent Young Partners Leave Biglaw for a High-Powered Boutique*, Above The Law (May 28, 2015, 10:03 AM), http://abovethelaw.com/2015/05/prominent-young-partners-leave-biglaw-for-a-high-powered-boutique. Mr. Consovoy has participated in

numerous cases before the Supreme Court in the last few Terms alone, including arguing two significant cases that were decided in 2016 and submitting numerous briefs on behalf his clients.

Mr. Consovoy has represented clients in actions against various federal agencies, including the National Park Service, the Environmental Protection Agency, and the Federal Communications Commission, and his knowledge and experience extends to taking cases. For example, he represented the National Association of Home Builders, among others, in urging the Supreme Court to take up an important and disputed question of the government's ability to circumvent the Takings Clause. *See* Brief of Cato Institute, Reason Foundation, and National Association of Home Builders as Amici Curiae in Support of Petitioner, *Common Sense Alliance v. San Juan Cnty.*, No. 15-1366 (U.S. June 10, 2016).

This case is likely to raise complex questions of constitutional and administrative law involving federal flood-control plans, various iterations of the Rivers and Harbors Act, and other issues unique to the law of emergency takings. Mr. Consovoy and the other lawyers at his firm have the experience—and, frankly, the complex thinking—necessary to tackle these complicated issues and they provide immeasurable value to the class.

### D. The JEC Group Can Commit Substantial Resources to Representing the Class.

In addition to Counsel's substantial abilities and experience, the JEC Group has devoted, and will continue to devote, significant resources toward resolving the thousands of claims at issue here. RCFC 23(g)(1)(A)(iv); *see also, e.g., King v. United*

*States,* 93 Fed. Cl. 718, 719, 719 n.2 (2010) (appointment in four class actions, commitment to devoting adequate resources, and anticipated support of law firm warranted appointment as class counsel). Judge Jefferson of Houston-based Coats Rose brings over 90 attorneys, substantial resources, and more than 30 years' experience working in the community to the case. Mr. Edelson's firm, Edelson PC[8]— which employs twenty-six attorneys in addition to numerous paralegals and technical staff—has repeatedly shown an ability to litigate large class actions such as this, often in the face of opponents with vastly superior resources.[9] Here, neither the size of the class nor the nature of the defendant would overwhelm the JEC Group's capabilities, as demonstrated in part by these past successes in cases involving tens of thousands of class members, where the defendants have been some of the largest corporations in the world (and employed some of the largest law firms in the country). As such, both the actual resources the JEC Group will put towards this case and demonstrated effectiveness in using those resources supports

---

[8]    Although based in Chicago, Mr. Edelson and other members of his firm have spent significant time in Houston from the outset of this litigation. In the event that the JEC Group is appointed lead counsel, Edelson PC intends to open and operate a local Houston office so that class members can easily meet with the firm.

[9]    *See, e.g., Wigod,* 673 F.3d at 585–86 (successful appeal of dismissal of multibillion dollar lawsuit against Wells Fargo Bank over failure to honor loan modifications); Herb Weisbaum, *How You Could Get $500 Per Call For Those Unwanted Messages Six Years Ago*, NBC News (Jan. 17, 2017) (documenting Edelson's achieving the largest class action settlement in the history of the Telephone Consumer Protection Act); Dawn Rhodes, *California Judge: Illinois Facebook 'Tagging' Lawsuit Can Proceed*, Chi. Trib. (May 10, 2016), http://www.chicagotribune.com/news/local/breaking/ct-facebook-lawsuit-20160510-story.html (Edelson victory on motions to dismiss and for summary judgment in a class action lawsuit against Facebook).

appointing them as lead class counsel.

**E. The JEC Group's Position on Fees is in the Best Interests of the Class.**

Finally, the JEC Group strongly believes that the issue of attorney compensation is "other information relevant to this assignment." (Oct. 11, 2017 Order at 6). Indeed, "compensation of designated counsel" and "whether there are clear and satisfactory guidelines for compensation and reimbursement" are among the most important factors to assess when appointing lead counsel. Manual for Complex Litigation (Fourth) § 10.224. And the Court "may include in the appointing order provisions about the award of attorney's fees," RCFC 23(g)(1)(D), and the "best time" to determine how class counsel will ultimately be compensated "is the beginning of the case, not the end," *In re Synthroid Marketing Litigation*, 264 F.3d 712, 718–19 (7th Cir. 2001); Manual for Complex Litigation (Fourth) § 14.211 ("Judges should consider advising the parties at the outset of the litigation about the method to be used for calculating fees . . . .").

While some of the attorneys and law firms seeking to be lead counsel here have been signing up property owners under the mistaken impression that they will receive some percentage of the class's recovery,[10] that is not how counsel are paid in

---

[10]     Lawyers' having incorrect views as to how fees should be awarded can have substantial negative consequences for the class members that they represent. For example, in *Haggart v. Woodley*, another takings case, class counsel incorrectly sought and was awarded fees on a common fund basis—i.e., 35% of the total recovery for the settlement class—following a class wide settlement. 809 F.3d 1336, 1340–41 (Fed. Cir. 2016). The result was a lengthy delay in providing the agreed-upon relief to the settlement class as certain class members objected to the

takings cases. Congress has provided for statutory fee-shifting in such cases, *see* 42 U.S.C. § 4654(c), meaning that the government—not the plaintiffs—will pay class counsel. *See Haggart*, 809 F.3d at 1357. Furthermore, the amount of such a fee award is calculated "using the lodestar method[,] which is the product of reasonable hours times a reasonable rate." *Id.* at 1354–55 (internal quotations omitted). Use of the common fund doctrine—in which attorneys are awarded a percentage of the class's recovery—is preempted. *Id.* at 1354–59. Thus, to avoid confusion and so that "both [class] counsel and class members can decide whether it is worthwhile to proceed with that compensation system in place," *Synthroid*, 264 F.3d at 719, this Court should include in its appointment order that lodestar is the sole method by which class counsel will ultimately be paid.

In addition, however, the JEC Group believes that this Court should also limit to lodestar the fee amount that any counsel representing plaintiffs who ultimately opt into the class(es) can collect. The Court has both equitable and inherent power to limit attorneys' fees in this way, *see, e.g., In re Vioxx Prods. Liab. Litig.*, 650 F. Supp. 2d 549, 558–60 (E.D. La. 2009); *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179, 2012 WL 2236737 (E.D. La. June 15, 2012), and should they be appointed, the JEC Group will be committed to helping ensure that lawyers are appropriately limiting their fees. There are at least two reasons why fee agreements should be so limited.

---

requested fee award, then appealed the trial court's award of fees, and the settlement approval and fee award were vacated and remanded for further proceedings. *Id.*

First, doing so mitigates the free-rider problem. Much of the work performed by counsel for the class—including fact discovery, expert discovery, and establishing liability—will benefit *all* plaintiffs. In other words, attorneys representing plaintiffs who do not opt into the class will be able to sit and wait for class counsel to obtain favorable results for the class, and then piggyback on those efforts. *See Vioxx*, 650 F. Supp. 2d at 563 ("Attorneys did not have to pursue individual discovery, nor did they have to file individual motions, engage in individual settlement negotiations, or prepare individual trial plans. Instead, many of the plaintiffs' attorneys in the Vioxx MDL were able to simply wait while a $4.85 billion settlement was negotiated and then do no more than enroll their clients in the settlement and monitor their progress through the claims valuation process."). That same sit-and-wait approach will be detrimental to property owners in this litigation, and it shouldn't be the attorneys who benefit from economies of scale and other efficiencies of class actions at the expense of their clients.

Which leads to the second reason to limit attorneys to lodestar: Allowing plaintiffs' attorneys to take a percentage of their clients' recovery from the government directly diminishes plaintiffs' ability to rebuild their homes and businesses. This litigation is about getting full compensation for plaintiffs' losses, and the inverse condemnation process—with its lodestar-based fee-shifting requirement—was put in place consistent with that principle. Plaintiffs are not made whole—and will be unable to completely rebuild—if their lawyers take a sizable portion of their recovery. Thus, there is a second conflict of interest to be

aware of that is particularly acute in this case: the inherent conflict of interest between clients and attorneys with a contingent fee agreement. In light of ethical requirements that attorneys charge only a reasonable fee, this Court can police such agreements. *See Vioxx*, 650 F. Supp. 2d at 559–60. Given the factual context—a city trying to rebuild after one of the most devastating natural disasters in its history— this litigation can't be about enriching lawyers at the expense of their clients. To guard against such a result, this Court should require that even non-class counsel fees be limited to lodestar. Alternatively, if this Court believes that it cannot or should not bar contingent fee arrangements completely, it should place a reasonable limit of, say, 6% on such fees.[11]

## VI. CONCLUSION

For the foregoing reasons, the JEC Group respectfully requests that this Court appoint it lead counsel for the downstream class.

---

[11]     While a uniform rule for attorneys' fees is generally desirable in cases such as this, *see Vioxx*, 650 F. Supp. 2d at 560, 563 (stressing importance of "uniform" and "consistent" standards for determining attorneys' fees in large cases with high public profiles), there of course may be unique circumstances in which a different fee may be appropriate. Consequently, the JEC Group recommends that this Court provide a mechanism for attorneys who believe that a deviation is required in their case to so petition this Court with notice to their clients. *See, e.g., id.* at 564 ("[I]t is not unreasonable to conclude that certain rare circumstances might exist which would warrant a departure, in either direction, upwards or downwards, from the universal fee cap. If an attorney believes that such a departure is appropriate in a particular case, it will be incumbent upon that attorney to file an objection with the Court . . . and to serve the involved client."); *Deepwater Horizon*, 2012 WL 2236737 at *2 (setting out procedure to deviate from fee cap, which required attorneys to serve objection on client and permitted client to submit contrary evidence). If certain counsel believe their services are worth one-third of their client's homes, for example, they should be able to explain why that is so to both this Court and their clients.

Dated: October 20, 2017                    /s/ Jay Edelson

Jay Edelson
jedelson@edelson.com
EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378


Of Counsel:

Hon. Dwight E. Jefferson
djefferson@coatsrose.com
COATS ROSE
9 Greenway Plaza, Suite 1100
Houston, Texas 77046
Tel: 713.651.0111
Fax: 713.651.0220

William S. Consovoy
will@consovoymccarthy.com
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
Tel: 703.243.9423

Michael L. Slack
mslack@slackdavis.com
Slack & Davis, L.L.P.
2705 Bee Cave Road, Suite 220
Austin, Texas 78746
Tel: 521.795.8686